UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF NEW JERSEY, NAACP NEW JERSEY STATE CONFERENCE, WILLIAM M. RIGGS, SHAMISA ZVOMA, and DEBORAH J. RISKA,<br><br>　　　　　　　　　　Plaintiffs,<br><br>v.<br><br>TAHESHA WAY, in her official capacity as Secretary of State of the State of New Jersey,<br><br>　　　　　　　　　　Defendant | Civil Action No: 3:20-cv-05990-MAS-LHG<br><br>**FIRST AMENDED COMPLAINT** |

**INTRODUCTION**

1.     This case raises fundamental legal questions about the integrity of New Jersey's democratic processes generally, and its disparate impact on voters with disabilities, the elderly and very young voters, Black, Latina/o, and other voters of color, and voters for whom English is a second language. New Jersey's failure to provide mail-in and provisional voters with prompt notice of, and opportunity to cure, signature-related issues is unconstitutional.

2.     The State of New Jersey guarantees every voter the right to cast their ballot by mail, and guarantees every voter, under certain circumstances, the right to vote by provisional ballot at polling places on Election Day. But each election,

thousands of mail-in and provisional voters are effectively disenfranchised when the State rejects their mail-in or provisional ballots because of inadvertent signature-related errors or matters of penmanship. The State gives the voter no opportunity to remedy the perceived impairment so that their vote may be counted.

3.     New Jersey's failure to provide mail-in and provisional voters with notice and an opportunity to cure signature-related errors before rejecting their vote-by-mail and provisional ballots is unconstitutional under any circumstance, depriving mail-in voters of their fundamental right to vote in violation of the First and Fourteenth Amendments to the United States Constitution, as well as their right to due process of law in violation of the Fourteenth Amendment to the United States Constitution.

4.     This year, amidst the COVID-19 pandemic, the issue takes on greater urgency because of New Jersey's already demonstrated—and dramatic—shift towards voting by mail. While historically fewer than 10 percent of New Jersey voters voted by mail, pursuant to an executive order issued by Governor Phil Murphy directing all-mail elections to protect public health, all voters who participated in the May 12, 2020 elections had no choice but to do so.[1] Likewise, the July 7, 2020 primary and November 3, 2020 general elections will see a multifold increase in vote

---

[1] *See* N.J. Exec. Order No. 105 (Mar. 19, 2020), https://nj.gov/infobank/eo/056murphy/pdf/EO-105.pdf.

by mail. Other than an accommodation for certain members of the disability community, the July 7, 2020 Election will be conducted wholly through vote-by-mail and provisional ballots.[2]

5.      Mail-in and provisional voters deserve the same confidence that their vote will be counted as if they voted by machine at their local polling site on Election Day. But current New Jersey law precludes such confidence. In the upcoming elections, the State's procedurally flawed signature-verification system will likely cause thousands, or even tens of thousands, of vote-by-mail and provisional ballots to go uncounted, and thus result in thousands or tens of thousands of New Jerseyans losing their voice in the political process.

**THE PARTIES**

6.      Plaintiff League of Women Voters of New Jersey ("LWVNJ") is a membership organization dedicated to promoting civic engagement and protecting democracy through advocacy, voter education, and voter assistance. As part of its mission, LWVNJ advocates for expansion of voting opportunities, including through vote-by-mail, and provides information directly to members who wish to vote by mail, including by providing links on its website where members can find information about voting by mail, download an application to vote by mail, and view

[2] *See* N.J. Exec. Order No. 144 (May 15, 2020), https://nj.gov/infobank/eo/056murphy/pdf/EO-144.pdf.

a guide to completing the application. LWVNJ has about 1,450 members across the state. A substantial number of them have previously voted by mail and even more members intend to vote by mail in New Jersey's upcoming elections. LWVNJ's membership is broad and diverse and includes many individuals who due to age or disability are at heightened risk of being denied the right to vote because of signature issues. Members have likely been denied the right to vote due to signature issues in previous elections and are statistically likely to be denied the right to vote due to signature issues in upcoming elections.

7.    Plaintiff NAACP New Jersey State Conference (NJ NAACP) is an affiliate of the National Association for the Advancement of Colored People, a non-profit corporation. The mission of the NJ NAACP is to ensure the political, educational, social, and economic equality of rights of all persons and to eliminate racial discrimination. The NJ NAACP has approximately 7,000 active members across the state. The NJ NAACP is active in Hudson County, the most diverse county in New Jersey, and the county that had the highest rate of ballot rejections due to signature issues in the state during the 2016 election.[3] The NJ NAACP also has a robust presence in Newark. Newark, the state's most populous city, has a population that is 50 percent Black. In 2014, Essex County, the county in which Newark is

---

[3] Election Administration and Voting Survey Datasets ("EAVS 2016") (2016), https://www.eac.gov/research-and-data/datasets-codebooks-and-surveys.

located, had the highest rate of ballots rejected because of a signature issue in the state.4

8.     A substantial number of NJ NAACP members have previously voted by mail and even more members intend to vote by mail in New Jersey's upcoming elections. NJ NAACP's members have likely been denied the right to vote due to signature issues in previous elections and are statistically likely to be denied the right to vote due to signature issues in upcoming elections. Moreover, because of the State's failure to provide mail-in voters with notice of and an opportunity to cure signature-related issues, in Hudson and Essex Counties, as well as in other counties in the state with large Black and Brown communities, NJ NAACP's local branches must heighten efforts to educate voters about vote-by-mail, signature issues, and how to determine whether their ballots have been counted.

9.     Plaintiff William M. Riggs is a 78-year-old citizen of the State of New Jersey, residing in Middlesex County, who is registered to vote by mail and intends to vote by mail in all future elections. Plaintiff Riggs has Parkinson's Disease, a progressive nervous system disorder that affects movement. In 2004, he was diagnosed with Essential Tremor, a nervous system disorder that causes involuntary and rhythmic shaking. He was formally diagnosed with Parkinson's Disease in 2016.

---

4 Election Administration and Voting Survey Datasets ("EAVS 2014") (2014), https://www.eac.gov/research-and-data/datasets-codebooks-and-surveys.

Mr. Riggs's symptoms include a hand tremor—which varies unpredictably in severity—as well as physical instability.

10.     Mr. Riggs used to have excellent handwriting—often described as beautiful. But now, his hand tremor, which varies significantly in severity over time without predictability, has severely affected his penmanship. As a result, he sometimes finds his own signature to be illegible. Moreover, whereas he used to routinely sign his full name, he now often can sign his name only as "W.M. Riggs." As such, he reasonably believes that there is a substantial risk that his signature will be erroneously deemed inauthentic if compared to an earlier exemplar of his signature.

11.     Mr. Riggs used to vote exclusively in person but has ceased to vote in person because he no longer has a driver's license and due to his progressive disease, he is no longer able to safely drive. Moreover, given his age and health conditions, it would not be safe for him to vote in person in light of the current COVID-19 crisis.

12.     Plaintiff Shamisa Zvoma is a registered New Jersey voter who has been disenfranchised by New Jersey's unconstitutional signature matching regime. Plaintiff Zvoma resides in Montclair, New Jersey and is a member of the League of Women Voters of New Jersey.

13.     Ms. Zvoma is a longtime, avid voter, who votes in every election that she can. Because of the COVID-19 crisis, her town held its May 12, 2020 municipal

elections entirely by mail. As such, she—like all other voters in her town—had no choice but to cast her vote by mail-in ballot. Ms. Zvoma followed the instructions she was provided, filled out her ballot, signed it, and sent it back to the Essex County Board of Elections well in advance of Election Day.

14.     On May 22, 2020, Ms. Zvoma received a letter from the County Board informing her that her ballot "was not eligible to be counted" because they had determined the signature they had in her voter registration file did not match the one she provided on her ballot certification. The Board did not provide Ms. Zvoma with any opportunity to verify her ballot and have her vote counted in the May election.

15.     Plaintiff Zvoma is outraged and disheartened that her ballot was rejected. If the County had provided Ms. Zvoma with the opportunity to remedy the signature issue and have her ballot counted, she would have taken whatever steps were necessary to do so. This experience has diminished Ms. Zvoma's confidence in New Jersey's vote-by-mail system, and she fears that this will happen to her again in future elections.

16.     Plaintiff Deborah J. Riska has been disenfranchised by New Jersey's unconstitutional signature verification system in the last two general elections—in 2016 and again in 2018.

17.     Plaintiff Riska has been a registered New Jersey voter for 20 years. She resides in Ledgewood, New Jersey and is a regular voter. Ms. Riska has voted by

mail intermittently over the years. She is a mother and found that mail-in voting made voting more accessible, particularly when her children were young.

18.     In 2016, Ms. Riska was automatically enrolled on the permanent vote-by-mail list for her county. Since then, every time she has voted, she has voted by mail-in ballot, including in the 2016 general election. Ms. Riska's validly cast 2016 ballot, however, was not counted because of a perceived signature mismatch. She was not aware there was any issue with the ballot she cast in 2016 until recently, nearly four years after the election in question had concluded.

19.     In 2018, Ms. Riska cast her ballot for the November general election by mail for a second time. Again, her validly cast ballot was rejected and never counted because of a perceived signature mismatch. She was not informed that there was any issue with her ballot until she received a letter in January of 2019 notifying her that her ballot had been rejected because of a signature discrepancy. This was three months after the election, and Ms. Riska was not provided with any opportunity to remedy the ballot impairment to have her vote counted. If she were provided such an opportunity, Ms. Riska would have taken whatever steps were available to her to remedy the issue and have her vote counted.

20.     To avoid being disenfranchised again, Ms. Riska attempted to vote in-person at her polling location in 2019. When she arrived, though, she was told she could not vote in-person because she was on the mail-in ballot list. Ms. Riska was

refused the opportunity to vote provisionally. Plaintiff Riska believed voting by mail would be pointless, because her ballot would simply be rejected again. As a result, Ms. Riska decided not to vote in that election at all.

21.    This experience has shaken Plaintiff Riska's confidence in New Jersey's election system. Ms. Riska no longer trusts that her ballot will be counted if she casts it by mail, and she has doubts about the integrity and legitimacy of the ballot counting process. While Ms. Riska intends to participate in future elections, she will not feel secure casting a mail-in ballot until this problem has been addressed.

22.    Defendant Tahesha Way is the Secretary of State of New Jersey and serves as New Jersey's chief election official. N.J. Stat. § 52:16A-98. She is responsible for administering elections in New Jersey, including through the promulgation of rules and regulations necessary to effectuate elections conducted by mail, N.J. Stat. §§ 19:62-13 and 19:63-3, and the signature verification process specifically, N.J. Stat. § 19:62-3(c).[5] Through the Administrative Procedures Act, N.J. Stat. §§ 52:14B-1 to 24, she has broad powers to promulgate rules to effectuate

---

[5] Although § 19:62-3(c) and § 19:62-13 refer to rules and regulations promulgated by the Attorney General, "any references to the Attorney General relative to any elections matter appearing in the statutory law shall be a reference to the Secretary of State, unless the context or language of the statute provides otherwise." N.J. Stat. § 52:16A-98(b).

the language and spirit of New Jersey's election statutes. She is being sued in her official capacity.

## JURISDICTION AND VENUE

23.   Plaintiffs bring this action under 42 U.S.C. § 1983. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a).

24.   This Court has jurisdiction to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

25.   This Court has personal jurisdiction over the Defendant, who resides in this district and is sued in her official capacity.

26.   Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

## FACTS

### *Vote By Mail in New Jersey*

27.   In New Jersey, any qualified voter may request a mail-in ballot. N.J. Stat. § 19:63-3(a).

28.   Certain qualified municipalities with populations of 500 people or less may elect to conduct all elections entirely by mail, and voters in those jurisdictions are automatically provided with mail-in ballots. N.J. Stat. § 19:62-2(a-b).

29.   To request a mail-in ballot, a voter must provide their name, the address at which they are registered to vote, the address to which they want their ballot sent, their phone number, and their signature. N.J. Stat. § 19:63-3(a-b) The voter may also

provide their email address and opt to enroll in the permanent by-mail voter list to receive mail-in ballots in all future elections without submitting any further request. N.J. Stat. § 19:63-3(e)(1). As a result, some mail-in voters submit their mail-in ballot request months or years before the upcoming election in which they will cast a ballot.

30.     Once the county clerk in the voter's county of registration receives their mail-in ballot application, the clerk must verify the voter's identity by comparing the signature on the ballot request form to the signature the voter provided when they registered to vote. N.J. Stat. § 19:63-8. If the clerk deems the signatures a match, the vote-by-mail application is approved, and the voter is added to the rolls of individuals who may vote by mail. *Id.* If the clerk believes the signatures do not match, the application is disapproved, and the voter is notified of the disapproval and the reason therefor. *Id.* Alternatively, the clerk may also use "any other available information" to make the eligibility determination. *See* N.J. Stat. § 19:63-8.

31.     Beginning 45 days prior to an election, the State sends mail-in ballots to voters on the vote-by-mail rolls. N.J. Stat. § 19:63-9.

32.     Although voters generally complete this process independently and in secret, they can receive assistance from a family member. N.J. Stat. §§ 19:63-13, 19:63-16.

33.     On information and belief, neither the State, nor any of New Jersey's 21 county clerks' offices, warns voters that the signatures they provide throughout

this process will be examined to determine the validity of their ballots once they are cast. N.J. Stat. §§ 19:63-11, 19:63-13. Nor do the State or counties inform voters that if their local election official finds a discrepancy with their signature, the official will reject their ballot entirely.

34.     Rather, in at least some New Jersey counties, including Middlesex and Monmouth, mail-in voters are informed that all mail-in ballots are counted and included in the election results.[6]

35.     Promptly upon receiving a mail-in ballot, the county board of elections in the voter's county of registration must examine a voter's ballot envelope to determine if the ballot was validly cast. If the county board of elections determines that a voter's signature is missing or does not "match" either the signature on the voter's mail-in ballot application form or their signature in the statewide voter registration system, the ballot is rejected as invalid and not counted. N.J. Stat. § 19:63-17.

36.     Upon information and belief, New Jersey does not require that officials of the State's 21 county boards of elections receive any training in signature

---

[6] *See* Middlesex County NJ, FAQ About Elections, http://www.middlesexcountynj.gov/Government/Departments/CS/Pages/County%20Clerk/FAQ%20About%20Elections.aspx (last visited May 13, 2020); Monmouth County Votes, Vote By Mail, https://www.monmouthcountyvotes.com/voter-information/vote-by-mail/ (last visited May 13, 2020).

or handwriting analysis, nor does it provide them with written standards or guidelines to aid in this assessment.

37.    Upon information and belief, New Jersey does not require officials in any of the State's 21 counties to spend any minimum amount of time comparing the signature exemplars when examining mail-in ballots.

38.    New Jersey does not provide voters whose mail-in ballots are deemed to have signature-related defects with any pre-deprivation notice, nor does it give the voter any opportunity to cure the defect.

39.    Indeed, New Jersey law only requires that the State provide voters with a "free-access system," such as a toll-free hotline or website, that they may access *after* the election has concluded to determine whether their ballot was counted, or the reason for its rejection, if applicable. N.J. Stat. § 19:61-5. At that point, if a voter learns that New Jersey has rejected their ballot—either by affirmatively inquiring themselves or through any post-deprivation notice—the voter has no opportunity to have their vote counted.

40.    This contrasts sharply with New Jersey's process for mail-in ballot applications, where the voter is notified if there is any deficiency related to their signature that results in the rejection of their application, enabling them to renew their application or choose to vote in person. N.J. Stat. § 19:63-8.

41.     Similarly, New Jersey law requires that signature comparisons performed by election officials during in-person voting occur openly and publicly. If any challenge is raised concerning the authenticity of a voter's signature during in-person voting, the voter is permitted to establish, in real time, their right to vote by appropriate proof. N.J. Stat. §§ 19:15-17(a), 19:15-18.1. Mail-in voters are given no such opportunity.

42.     Mail-in voting need not be conducted this way. New Jersey law specifically authorizes Defendant Way to adopt rules and regulations to govern the vote by mail system. State law also charges Defendant Way with overseeing the training of local election officials. N.J. Stat. § 19:50-1(b).

43.     It is within Defendant's power to ensure that mail-in voters are provided with pre-rejection notice and a meaningful opportunity to cure, and to implement any other trainings or guidelines necessary to standardize the signature verification process across New Jersey's 21 counties. Defendant has issued no rules or regulations, prepared no guidelines, and conducted no trainings to standardize the signature verification process or provide absentee voters with pre-deprivation notice of signature mismatches and an opportunity to cure.

44.     Implementing a pre-rejection notice and opportunity to cure procedure for voters would not significantly burden the State. State and local election officials already have access to voter files containing voter information such as addresses,

phone numbers, and emails, which they could use to provide mail-in voters whose ballots have signature related impairments with notice that their ballot may be rejected and an opportunity to cure.

*Provisional Ballots in New Jersey*

45.     While in-person voting in New Jersey is typically by machine, there are certain circumstances when a voter is not permitted to vote by machine. If a question regarding the voter's eligibility to vote in the precinct arises, the ordinary resolution is a provisional ballot that can later be verified.

46.     In New Jersey, any registered voter who appears at a polling place on Election Day may vote by provisional ballot if (a) they moved within a municipality, but to a different election district, and did not update their address; (b) they moved within a county and did not update their address; (c) their registration information is missing; or (d) if the voter has applied for a mail-in ballot and did not receive nor submit it.  N.J. Stat. § 19:53C-3.

47.     On May 15, 2020, Governor Murphy signed Executive Order 144. The Order mandates that: "Any voter who appears at a polling place on the day of the July primary shall vote via a provisional ballot, except that a voter with disabilities may vote on an ADA-accessible voting machine."[7]

---

[7] *See* N.J. Exec. Order No. 144, ¶ 10 (May 15, 2020), https://nj.gov/infobank/eo/056murphy/pdf/EO-144.pdf.

48.     When voting via a provisional ballot, a voter at a polling place is handed a provisional ballot packet. This packet is prepared by the county clerk, or municipal clerk in a municipal election, and includes an envelope, affirmation statement, and a written notice. N.J. Stat. § 19:53C-1. The affirmation statement includes space for the voter's name, the reason for voting provisionally, space to provide the voters' most recent prior voter registration address, address of the day of the election, and the voter's date of birth. *Id.*

49.     In addition, the affirmation includes the statement: "I swear or affirm, that the foregoing statements made by me are true and correct and that I understand that any fraudulent voting may subject me to a fine of up to $15,000, imprisonment up to five years or both, pursuant to R.S.19-34-11." *Id.* This language is followed immediately by space for the voter's signature and printed name. *Id.* The affirmation statement must be completed and signed by the voter prior to or immediately after casting the provisional ballot.  N.J. Stat. § 19:53C-6.

50.     While a written notice is included in the provisional ballot packet, the notice is not required to inform the voter that the ballot could be rejected because of a signature match issue. N.J. Stat. § 19:53C-1.

51.     Once the voter casts their ballot, the voter must place the ballot in the envelope, seal it, and hand it to a member of the district board. N.J. Stat. § 19:53C-10. The member of the district board hands the voter a written notice of instructions

on how the voter may access information regarding the status of the provisional ballot, whether their vote was counted, and if rejected, the reason for rejection. *Id.* There is no requirement for the notice to include a warning that the ballot may be rejected because of a signature match issue. *Id.*

52.     Once delivered to the county for counting, the process looks nearly identical to that governing mail-in ballots. Election officials are required to compare the voter's signature on their provisional ballot to the signature on their voter registration form. N.J. Stat. § 19:53C-13. If they do not match, the provisional ballot is rejected. Again, the officials who do these signature comparisons are not handwriting experts and receive no standard training or guidance from the State.

53.     There is also, similarly, no affirmative or pre-rejection notice requirement for provisional ballot rejections. While the State does allow provisional voters to call the hotline or check the Division of Elections' website to determine their status, they can only do so after the election has ended and votes are finalized. There is also no opportunity to cure. Instead, the majority of the county board makes a decision about the voter's ballot and that decision is "final." N.J. Stat. § 19:53C-18.

54.     Hundreds of provisional ballots in previous elections have been rejected because of signature mismatch issues. In 2018, almost 300 provisional

ballots were rejected because of no or mismatched signature.[8] This number will only increase this year as the only in-person voting option for the vast majority of voters will be via provisional ballot.

*New Jersey's Signature Verification Procedure for Mail-In and Provisional Ballots Is Unacceptably Error-Prone*

55.    Signature verification is an inherently flawed means of determining whether a mail-in or provisional ballot is fraudulent or inappropriately cast.

56.    No two signatures are exactly alike because of the many factors that affect the consistency of a person's signature from one signing (*i.e.*, the mail-in ballot application or voter registration) to another (*i.e.*, the mail-in ballot), including very variable factors such as type of pen, writing surface, stress, or other writing conditions.

57.    Signature variance is more common among certain populations of voters, including those with disabilities, those with less formal levels of education, elderly and young voters, and voters for whom English is a second language. Parkinsonism and other neurological disorders can also significantly affect handwriting characteristics, engender unfounded scrutiny over the authenticity of signatures, and impede accurate assessment of them.

---

[8] Election Administration and Voting Survey Datasets Version 1.2 ("EAVS 2018") (Feb. 18, 2020), https://www.eac.gov/research-and-data/datasets-codebooks-and-surveys.

58.     And while New Jersey does not maintain the racial or demographic data of those whose ballots are rejected, a study in Florida found that Black and Latina/o voters were more likely to have their ballots rejected. In 2016, 1.9% of Black voter ballots were rejected, 1.8% of Hispanic voter ballots were rejected, while only 0.7% of white voter ballots were rejected.[9]

59.     Even experienced forensic document examiners (FDEs) can find it difficult if not impossible to distinguish natural variations in a person's signature from fraudulent ones, especially where the reviewer has limited exemplars to compare.

60.     Laypersons, such as New Jersey election officials, have a significantly higher rate of error in determining whether signatures are genuine. Laypersons are also more likely to wrongly determine that authentic signatures are not genuine than to make the opposite error. In one study, laypeople incorrectly judged authentic signatures to be inauthentic more than 26% of the time.

61.     Thus, in every election, the untrained election officials responsible for signature verification under New Jersey's mail-in and provisional ballot verification system reject validly cast ballots because of erroneous judgments on signature matching issues.

[9] *See* Daniel A. Smith, *Vote-By-Mail Ballots Cast in Florida,* American Civil Liberties Union of Florida (Sep. 19, 2018), https://www.aclufl.org/en/publications/vote-mail-ballots-cast-florida.

62.    Also, because election officials undertake this task without standardized guidelines or procedures governing their analysis, they reject ballots based on arbitrary, variable criteria. Absentee ballot rejection rates for signature-matching issues therefore vary significantly from county to county in New Jersey. For example, in the 2016 general election, Hudson County, New Jersey's most diverse county, rejected mail-in ballots based on failure to match signatures at a rate 172 times the rejection rate in Gloucester County, one of the whitest counties in the state. EAVS 2016, *supra* note 2.

63.    Similarly, the rates of rejection for provisional ballots due to signature match vary by county. In 2018, Camden County, where one of New Jersey's most diverse cities, Camden, is located, the highest percentage of total provisional ballots cast were rejected because of signature match. In comparison, Warren and Cape May Counties—two of the whitest counties in New Jersey—appear to not have rejected any provisional ballots because of signature mismatch. EAVS 2018, *supra* note 8.

64.    The *unintentional* omission of a voter's signature from their mail-in or provisional ballot often reflects innocent user error rather than fraud or misconduct. Such an error could be easily resolved by providing the affected voter with notice of the problem and an opportunity to fix it.

*New Jersey's Constitutionally Deficient Signature-Verification Process Denies the Right to Vote to Thousands of Voters*

65.    Each election, New Jersey's signature verification system impacts thousands of New Jersey voters, often constituting at least one percent of all mail-in voters and hundreds of provisional ballot voters, who have their ballots rejected for benign signature-related deficiencies, including that they did not sign the ballot envelope or that their signature could not be "matched" to either the vote-by-mail application or the voter registration form.

66.    During the 2016 Presidential General Election, for example, over 355,000 New Jersey voters cast their ballots by mail. About 4,000 of those voters, representing nearly one percent of the by-mail votes cast in the election, did not have their votes counted because of a signature-related problem, including over 1100 rejected because of the perceived lack of a signature-match. EAVS 2016, *supra* note 2.

67.    Over 11% of all absentee ballots rejected statewide in the 2016 election were rejected based on a perceived lack of signature-match. *Id.* However, the likelihood of a signature-related ballot rejection varied significantly depending on the absentee voter's county of residence. For example, whereas 11.76% of rejected absentee ballots were for signature-mismatch issues in Union County, 38.97% of rejected absentee ballots were for signature-match issues in Hudson County. *Id.*

68.    Two years later, in the 2018 Midterm Election, the results were no better. Out of the approximately 400,000 New Jersey voters that cast their ballots by

mail, approximately 6,000, or about 1.5% of all by-mail voters, had their ballots rejected—and their votes consequently not counted—based on a signature-related deficiency, including nearly 2,000 due to the perceived lack of a signature-match. EAVS 2018, *supra* note 8.

69.     Again, the likelihood of a signature-related ballot rejection varied based on the absentee voter's county of residence. Whereas in the 2018 election, 16.4% of absentee ballots rejected statewide were rejected for signature-match issues, the rate of rejection varied dramatically from county to county. *Id*. For example, while 3.3% of rejected absentee ballots were rejected in Union County for signature-match issues, 34.9% of rejected mail-in ballots were rejected in Hudson County because of alleged signature mismatch. *Id.*

70.     There is similar variance among counties with respect to provisional ballot rejections because of signature issues. For example, 1 percent of total provisional ballots cast in Camden County were rejected because of signature mismatch, while 0% of those cast in Cape May County were rejected because of signature mismatch. *Id.*

71.     Upon information and belief, none of the voters whose ballots were rejected in the 2016 or 2018 elections received pre-rejection notice that their ballots were impaired by a signature defect, nor did they have any opportunity to cure the issue and have their vote counted. Upon information and belief, if these absentee or

provisional voters had been provided notice and an opportunity to cure before their ballots were rejected, many would have been able to verify their identity notwithstanding the signature-related discrepancy. As a result, the State rejected valid ballots cast by many eligible New Jersey voters.

72.    There is no legitimate state interest advanced by New Jersey's unreliable signature verification procedures, or by its failure to provide notice and an opportunity to cure when a ballot is rejected because of an ostensible signature-related defect.

*New Jersey's Constitutionally Deficient Signature-Verification Process Will Affect a Growing Number of Voters*

73.    The number of New Jerseyans who will vote by mail—and thus the number that will have their ballot rejected through New Jersey's signature-verification process—is likely to increase significantly in upcoming elections, including the July 7, 2020 primary election and the November 3, 2020 general election.

74.    Even before the May 12, 2020 election, which was conducted entirely by mail, voters in New Jersey had already begun choosing to vote by mail in increasing numbers, and their ability to do so was recently made even easier by New Jersey's expansion of its vote-by-mail law.

75.    The ongoing COVID-19 pandemic is expected to further accelerate New Jersey's dramatic shift towards mail-in voting. The State, echoing the Centers

for Disease Control and Prevention ("CDC") recommends that to protect themselves from COVID-19, all citizens should "stay at home . . . except to get essentials," and that "additional steps" may be warranted for older adults and those with chronic or underlying conditions that place them at increased risk of complications from the disease.[10] Moreover, the CDC's first recommendation for election officials in the midst of this pandemic is to "[e]ncourage mail-in methods of voting."[11]

76.     New Jersey also heeded the CDC's advice for the May 12, 2020 local elections, when Governor Phil Murphy ordered that all ballots be cast by mail. As a result, counties mailed all registered voters a vote-by-mail ballot. Without an application, the signature on the voter's ballot will be compared to the voter's registration form. This eliminated the nominal notice process New Jersey law has of alerting voters that their vote-by-mail application was rejected because of a signature match issue. Moreover, it ensured that the signature comparison process will be based upon even staler signatures dating back potentially decades.

77.     On May 15, 2020, Governor Phil Murphy announced the upcoming July primary elections will be held primarily by mail. Mail-in ballots will be sent to

[10] New Jersey COVID-19 Information Hub, https://covid19.nj.gov/faqs/nj-information/general-public/how-can-i-protect-myself-from-covid-19/novel-coronavirus (last updated May 7, 2020).
[11] Ctrs. for Disease Control and Prevention, Recommendations for Election Polling Locations, https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (last updated Mar. 27, 2020).

all registered Democratic and Republican voters and applications for mail-in ballots will be sent to all unaffiliated registered voters. In-person polling locations will be limited and, other than as an accommodation for members of the disability community, all voters will have to vote via provisional ballot. Between the expansion of vote-by-mail and the requirement for most voters who choose to vote in person to vote by provisional ballots, the vast majority of voters in New Jersey will be subject the State's signature match policy.

78.     Based on these state and federal recommendations, and out of their own sense of health and safety, New Jersey voters are expected to cast their ballots by mail in historic numbers in the upcoming July and November elections. By voting by mail where possible, New Jersey citizens can do their part to protect public health and reduce crowds and lines at polling locations that may be maintained to serve populations that rely on or strongly prefer in-person voting, including some people of color, voters with disabilities or language needs, or those with unreliable postal service.

79.     As a growing number of New Jersey voters rely on the State's mail and provisional voting system, whether by choice or necessity, more voters risk having their ballot rejected because of a signature-related impairment. Court intervention is necessary to ensure the State provides these voters with constitutionally necessary

notice and an opportunity to cure and to safeguard these voters' fundamental right to vote.

## FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983: Denial of Due Process Under the Fourteenth Amendment

80.    Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

81.    An individual has a liberty interest in the fundamental right to vote that is protected by the right to due process. New Jerseyans also have a statutorily protected liberty interest in voting by mail.

82.    At a minimum, procedural due process requires that the State provide its vote-by-mail and provisional voters with notice and a meaningful opportunity to be heard before being denied their protected liberty interest.

83.    The requirement for *pre-deprivation* notice is particularly important when deprivation will result in irreparable injury, as is the case with voting.

84.    New Jersey's failure to provide vote-by-mail and provisional voters with any opportunity to cure signature-related deficiencies with their ballot—particularly given the unreliability of signature matching and election officials' unfettered discretion to reject ballots—does not meet these minimum requirements of procedural due process and is thus unconstitutional.

85.     Such an opportunity to cure is particularly warranted here given the balance of implicated interests and harms. *See Mathews v. Eldridge,* 424 U.S. 319, 335 (1976). First, absent relief, vote-by-mail and provisional voters may be erroneously deprived of their fundamental right to vote. Second, the risk of erroneous deprivation caused by the unreliability of signature matching and election officials' unfettered discretion to reject ballots is high. Finally, the implementation of procedures to provide vote-by-mail and provisional voters with notice and an opportunity to cure would impose only a minimal burden on the State, which already maintains records during the ordinary course of business containing voter contact information, and already has infrastructure in place to carry out notice requirements given its existing legal obligation to inform mail-in voting applicants when their *application* is rejected because of a signature issue.

86.     Absent the implementation of procedural safeguards, including notice and a meaningful opportunity to cure perceived signature-related deficiencies before a vote-by-mail or provisional ballot is rejected, mail-in and provisional voters in New Jersey will continue to face a substantial risk of being deprived of their fundamental right to vote without due process.

87.     The State has no legitimate interest in permitting untrained local officials to reject voters' ballots based on an unreliable signature authentication process without providing voters any notice or opportunity to cure.

88.    New Jersey's current signature-verification procedure denies New Jersey voters procedural due process in violation of the Fourteenth Amendment.

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983: Denial of the Fundamental Right to Vote in Violation of the First and Fourteenth Amendments

89.    Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

90.    "There is no right more basic in our democracy than the right to participate in electing our political leaders." *McCutcheon v. FEC*, 572 U.S. 185, 191 (2014). The Supreme Court has recognized that "voting is of the most fundamental significance under our constitutional structure." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Illinois Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 184 (1979)).

91.    When analyzing the constitutionality of a restriction on voting, the Court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). Unreasonable,

severe, or discriminatory burdens on the right to vote are subject to particularly close constitutional scrutiny.

92.    Defendant's unreliable signature-verification process rejects a significant number of validly cast ballots every election cycle as a result of benign discrepancies or technical errors. Defendant denies the individuals who cast these ballots the right to vote without any pre-deprivation notice or opportunity to verify their ballots. This system operates without uniform standards across counties and therefore puts voters' ballots at risk of rejection based on arbitrary, variable criteria. Such a system imposes a severe burden on voters' fundamental right to vote.

93.    The severity of this burden is exacerbated by voters' increasing need to rely on mail and provisional ballots to effectively cast a ballot while safeguarding their health. Voters should not be required to risk their health or lives to cast a ballot they can be confident will count.

94.    As discussed above, each time a county board of elections—comprised of laypersons with no expertise in handwriting analysis—subjectively believes there is a mismatch between the signature accompanying the voter's mail-in or provisional ballot and the signature in the voter's file, that ballot is not counted, notwithstanding the many benign factors that can cause signature variation. And those factors place certain voters at heightened risk on the basis of their age, disability, national origin,

race, or educational background without notice that their votes, once cast, could be rejected, or that they cannot be cured once their ballots are rejected.

95.    In contrast to the mail-in and provisional voting system, voters facing signature verification issues at their polling location are afforded the opportunity to verify their identity and cast a ballot. New Jersey law affords no similar opportunities to mail-in and provisional voters.

96.    Defendant can proffer no justification for this error-prone and procedurally deficient system that would outweigh the injury the rejection of thousands of ballots each election inflicts on the eligible voters who cast those ballots.

97.    New Jersey's current signature verification procedure unduly burdens the right to vote in violation of the First and Fourteenth Amendments.

## THIRD CLAIM FOR RELIEF
## 42 U.S.C. § 1983: Denial of Equal Protection Under the Fourteenth Amendment

98.    Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

99.    The Equal Protection Clause of the Fourteenth Amendment requires "that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment,

value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000).

100. In the absence of any state-wide standards, New Jersey's unreliable and error-prone signature-verification procedures subject mail-in and provisional voters to arbitrary differences in the way signatures are analyzed depending on the county in which they reside.

101. This standardless system has led to significantly disparate rates of signature matching rejections from county to county in New Jersey.

102. New Jersey's reliance on signature matching to verify mail-in and provisional voters, without any standardized guidance, training, or procedures in place to provide such voters with notice and an opportunity to cure signature-related ballot rejections, does not further any compelling or legitimate state interest sufficient to justify the unequal treatment of voters.

103. New Jersey's current signature verification procedure violates the Equal Protection Clause of the Fourteenth Amendment.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that this Court:

(a) Issue a declaratory judgment that New Jersey's existing signature verification procedures for mail-in and provisional voting unlawfully

infringe the right to due process in violation of the Fourteenth Amendment to the Constitution of the United States;

(b) Issue a declaratory judgment that New Jersey's existing signature verification procedures for mail-in and provisional voting unlawfully impose an undue burden on the right to vote in violation of the First and Fourteenth Amendments to the Constitution of the United States;

(c) Issue a declaratory judgment that New Jersey's existing signature verification procedures for mail-in and provisional voting unlawfully infringe the guarantee of equal protection in violation of the Fourteenth Amendment to the Constitution of the United States;

(d) Issue preliminary and permanent injunctions enjoining Defendant, her agents, employees, and successors, and all those persons acting in concert or participation with them from implementing signature verification procedures that infringe constitutional rights;

(e) Preliminarily and permanently order Defendant to establish a procedure by which voters may attempt to cure deficiencies in their mail-in and provisional ballots, to include providing timely notice of such deficiencies and a meaningful opportunity to cure;

(f) Grant Plaintiffs' attorney's fees, costs, and litigation expenses pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 12133; and

(g) Grant other and further relief that the Court may determine to be necessary

or proper.

Dated: June 3, 2020

Respectfully submitted,

CAMPAIGN LEGAL CENTER

Danielle Lang*
Rob Weiner*
Ravi Doshi*
Dana Paikowsky*^
1101 14th Street NW, Suite 400
Washington, DC 20005
Telephone: (202) 736-2200

KAUFMAN LIEB LEBOWITZ & FRICK LLP

/s/ Alanna Kaufman
Alanna Kaufman
David A. Lebowitz*
10 East 40th Street, Suite 3307
New York, NY 10016
Telephone: (212) 660-2332

NEW JERSEY INSTITUTE FOR SOCIAL JUSTICE

Ryan Haygood
Andrea McChristian*
Henal Patel
60 Park Place, Suite 511
Newark, New Jersey 07102
Telephone: (973) 624-9400

* *Pro hac vice* application pending
^Licensed in C.A. only;
supervision by Danielle Lang, D.C.
Bar member.

*Counsel for Plaintiffs*