UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF NEW JERSEY, NAACP NEW JERSEY STATE CONFERENCE, WILLIAM RIGGS, SHAMISA ZVOMA, and DEBORAH J. RISKA, <br><br> Plaintiffs, <br><br> v. <br><br> TAHESHA WAY, in her official capacity as Secretary of the State of New Jersey, <br><br> Defendant. | No. 3:20-cv-05990-MAS-LHG |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION
FOR A PRELIMINARY INJUNCTION**

i

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................IV

INTRODUCTION ........................................................................... 1

STATEMENT OF FACTS ..................................................................3

I.    Vote By Mail in New Jersey .......................................................3

II.   Provisional Voting in New Jersey...............................................7

III.  New Jersey's Signature Verification Procedure for Mail-In and
      Provisional Ballots Is Unacceptably Error-Prone .................... 10

IV.   New Jersey's Constitutionally Deficient Signature-Verification Process
      Denies the Right to Vote to Thousands of Voters ................... 13

V.    New Jersey's Constitutionally Deficient Signature-Verification Process
      Will Affect a Growing Number of Voters ............................... 15

ARGUMENT ..............................................................................19

I.    Plaintiffs Will Succeed on the Merits of Their Claims........................... 20

      A.   Plaintiffs Will Prevail on the Merits of Their Procedural Due
           Process Claim ................................................................ 20

           1.   The Private Interest at Stake Is Fundamental ............................. 22

           2.   New Jersey's Procedures Guarantee Erroneous Deprivations,
                And the Additional Safeguards Plaintiffs Seek Would Avoid
                These Errors ............................................................. 24

           3.   The State's Interest in Rejecting Ballots Without Meaningful
                Pre-Deprivation Process Is Minimal ............................................ 27

      B.   Plaintiffs Will Prevail on the Merits of Their Claim that New
           Jersey Unconstitutionally Burdens the Fundamental Right to
           Vote. ........................................................................ 29

           1.   New Jersey's Use of an Error-Prone Signature Match System
                Severely Burdens Plaintiffs' Right to Vote.................................. 30

2.    New Jersey's Interest in Maintaining its Signature Match
      Procedures Does Not Outweigh the Severe Burden It Places on
      Plaintiffs' Right to Vote. ................................................................31

C.    Plaintiffs Will Prevail on the Merits of Their Equal Protection
      Claim .............................................................................................32

II.   Plaintiffs Will Face Irreperable Harm Absent An Injunction ................35

III.  The Balance of Harms and the Public Interest Weigh Heavily in
      Plaintiffs' Favor .....................................................................................35

CONCLUSION ................................................................................................37

# TABLE OF AUTHORITIES

## CASES

*Alvin v. Suzuki*, 227 F.3d 107 (3d Cir. 2000) ...........................................................20

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ...................................................29, 32

*Augustin v. City of Philadelphia*, 897 F.3d 142 (3d Cir. 2018)............................21

*Barefoot v. City of Wilmington*, 306 F.3d 113 (4th Cir. 2002)...............................20

*Burdick v. Takushi*, 504 U.S. 428 (1992) ..............................................................29

*Bush v. Gore*, 531 U.S. 98 (2000) ...................................................................32, 34

*Cook v. Randolph County*, 573 F.3d 1143 (11th Cir. 2009)...................................20

*Council of Alternative Political Parties v. Hooks*, 121 F.3d 876 (3d Cir. 1997)
................................................................................................................34, 35

*Dee v. Borough of Dunmore*, 549 F.3d 225 (3d Cir. 2008) ...................................24

*Democratic Executive Committee of Florida v. Lee*, 915 F.3d 1312 (11th Cir.
2019) ... .........................................................................................31, 33, 36

*Eu v. San Francisco County Democratic Central Committee*, 489 U.S. 214
(1989) ...............................................................................................................36

*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016) .....................................................34

*Florida Democratic Party v. Detzner*, No. 16 Civ. 607, 2016 WL 6090943
(N.D. Fla. Oct. 16, 2016) ...........................................................................27, 31

*Kos Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700 (3d Cir. 2004)..............19

*La Follette v. Padilla*, No. CPF-17-515931, 2018 WL 3953766 (Cal. Super.
Ct. Mar. 5, 2018) ..............................................................................................26

*League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224
(4th Cir. 2014) ..................................................................................................35

*League of Women Voters of Ohio v. Brunner*, 548 F.3d 463 (6th Cir. 2008) ........34

*Marks v. Stinson*, 19 F.3d 873 (3d Cir. 1994) .......................................................37

*Martin v. Kemp*, 341 F. Supp. 3d 1326 (N.D. Ga. 2018) ..........................22, 26, 28

*Mathews v. Eldridge*, 426 U.S. 319 (1976) ....................................................21, 22

*McCutcheon v. FEC*, 572 U.S. 185 (2014) .............................................................22

*Montanez v. Secretary Pennsylvania Department of Corrections*, 773 F.3d
    472 (3d Cir. 2014) ............................................................................................24

*Morrissey v. Brewer*, 408 U.S. 471 (1972) ............................................................20

*Nken v. Holder*, 556 U.S. 418, 435 (2009) ............................................................35

*Northeast Ohio Coalition for the Homeless v. Husted*, 696 F.3d 580 (6th Cir.
    2012) ................................................................................................................30

*O'Brien v. Skinner*, 414 U.S. 524 (1974) ..............................................................23

*Patriot Party of Allegheny County v. Allegheny County Department of
    Elections*, 95 F.3d 253 (3d Cir. 1996) ..........................................................29

*Paul v. Davis*, 424 U.S. 693 (1976) .......................................................................22

*Pierce v. Allegheny County Board of Elections*, 324 F. Supp. 2d 684 (W.D.
    Pa. 2003) .........................................................................................................32

*Raetzel v. Parks/Bellemont Absentee Election Board*, 762 F. Supp. 1354 (D.
    Ariz. 1990) ......................................................................................................22

*Reynolds v. Sims*, 377 U.S. 533 (1964) .................................................................34

*Robb v. City of Philadelphia*, 733 F.2d 286 (3d Cir.1984) ...................................20

*Schmidt v. Creedon*, 638 F.3d 587 (3d Cir. 2011) ................................................21

*Saucedo v. Gardner*, 335 F. Supp. 3d 202 (D.N.H. 2018) ............................*passim*

*United States v. Velasquez*, 64 F.3d 844 (3d Cir. 1995).........................................24

*Wilkinson v. Austin*, 545 U.S. 209 (2005) .............................................................22

*Wilmouth v. Secretary of N.J.*, 731 F. App'x 97 (3d Cir. 2018) ..............................29

*Zessar v. Helander*, No. 05 Civ. 1917, 2006 WL 642646 (N.D. Ill. Mar. 13, 2006) ................................................................................22, 26


**STATUTES**

N.J. Stat. § 19:50-1 ..............................................................................6

N.J. Stat. § 19:53C-1 ..............................................................................8

N.J. Stat. § 19:53C-3 ..............................................................................7

N.J. Stat. § 19:53C-6 ..............................................................................8

N.J. Stat. § 19:53C-10 ..............................................................................8

N.J. Stat. § 19:53C-13 ..............................................................................9

N.J. Stat. § 19:53C-18 ..............................................................................9

N.J. Stat. § 19:61-5 ..............................................................................6, 28

N.J. Stat. § 19:62-2 ..............................................................................3

N.J. Stat. § 19:63-3 ..............................................................................3

N.J. Stat. § 19:63-8 ..............................................................................4, 6, 26, 28

N.J. Stat. § 19:63-9 ..............................................................................4

N.J. Stat. § 19:63-11 ..............................................................................5

N.J. Stat. § 19:63-13 ..............................................................................4, 5

N.J. Stat. § 19:63-17 ..............................................................................4, 27

**INTRODUCTION**

Every election cycle, New Jersey election officials throw away thousands of valid mail-in and provisional ballots because they mistakenly believe there is some defect or discrepancy with voters' signatures. New Jersey does not tell voters when their vote is rejected. It gives them no opportunity to object or to demonstrate that their vote was properly cast. In sum, New Jersey disenfranchises these voters, unfairly, irrevocably, and without warning.

This system is as inaccurate as it is peremptory. The State offers no training in signature analysis to the officials making these determinations. It provides no formal guidance as to how they should assess the authenticity of mail-in and provisional ballots. It has adopted no standards to ensure that signature verification of mail-in and provisional ballots is uniform or reliable.

Instead, election officials have unbridled discretion to refuse to count properly cast ballots based on their arbitrary assessment of the voter's penmanship. Unsurprisingly, rejection rates vary wildly from county to county; a voter from one of the state's larger and more diverse municipalities is many times more likely to have her ballot rejected than the average New Jerseyan. Counties with the most Black people and non-English speakers often have the highest rates of rejection due to signature match. Worse still, the populations that rely most on mail-in voting— people with disabilities, older voters, and those with chronic health conditions—are

1

often less able to produce consistent signatures and thus are disproportionately disenfranchised by this unconstitutional system.

New Jersey must provide all citizens who vote by mail and provisional ballot with the opportunity to cure signature verification issues before it discards their ballots. The COVID-19 pandemic makes the threat of disenfranchisement under this system particularly acute, as almost every New Jersey voter will vote either by mail or provisional ballot in the upcoming July 7 primary election.

New Jersey's May 12, 2020 all-mail local elections provided a window into the dangers of proceeding under this system. Voters across the state—who had no choice but to vote by mail because changes the State made in light of COVID-19— had their validly cast mail-in ballots thrown away because the State mistakenly believed their signatures did not match, diminishing the voters' confidence in New Jersey's vote-by-mail system and casting doubt on the legitimacy of the outcome of close elections.

With statewide primary and general elections impending, the State's failure to provide the most basic procedural protections to mail-in and provisional voters subjects Plaintiffs to a risk of imminent and irreparable harm, threatens public confidence in elections, and subverts the critical public interest in ensuring that citizens can exercise their right to vote. Because New Jersey's signature matching procedure deprives voters of their right to vote, violates due process, and denies them

2

equal protection under the law as required by the Fourteenth Amendment to the United States Constitution, Plaintiffs seek a preliminary injunction pending disposition of their claims.

## FACTS

## I.     VOTE BY MAIL IN NEW JERSEY

In New Jersey, any qualified voter may request a mail-in ballot. N.J. Stat. § 19:63-3(a).

Certain qualified municipalities with populations of 500 people or less can conduct all elections entirely by mail, and voters in those jurisdictions automatically receive mail-in ballots. N.J. Stat. § 19:62-2(a-b).

Generally, though, to request a mail-in ballot, a voter must provide their name, the address at which they are registered to vote, the address to which they want their ballot sent, their phone number, and their signature. N.J. Stat. § 19:63-3(a-b). The voter may also provide their email address and opt to enroll in the permanent by-mail voter list to receive mail-in ballots in future elections without submitting any further request. N.J. Stat. § 19:63-3(e)(1). As a result, some mail-in voters submit their signed mail-in ballot applications months or years before the election in which they will cast mail-in ballots.

Once the county clerk in the voter's county of registration receives a mail-in ballot application, the clerk must attempt to verify the voter's identity by comparing

the signature on the ballot request form to the signature the voter provided when they registered to vote. N.J. Stat. § 19:63-8. If the clerk deems the signatures a match, she approves the vote-by-mail application and adds the voter to the rolls of individuals who may vote by mail. *Id.* If the clerk believes the signatures do not match, she disapproves the application and notifies the voter. *Id.* The law also allows the clerk to also use "any other available information" to make the eligibility determination. *Id.*

Beginning 45 days prior to an election, the State sends mail-in ballots to voters on the vote-by-mail rolls. N.J. Stat. § 19:63-9.

To cast their vote by mail, citizens must sign a certification on the inner envelope included with the mail-in ballot. N.J. Stat. § 19:63-13. Promptly upon receiving a mail-in ballot, the county board of elections in the voter's county of registration must examine a voter's ballot envelope to determine if the ballot was valid. If the county board of elections determines that a voter's signature is missing or does not "match" either the signature on the voter's mail-in ballot application form or their signature in the statewide voter registration system, they reject the ballot as invalid and do not count it. N.J. Stat. § 19:63-17.

Neither the State nor any of New Jersey's 21 county clerks' offices warns voters that the signatures they provide in returning their ballot will be compared to earlier signatures to determine the validity of their ballots. *See* N.J. Stat. §§ 19:63-

11, 19:63-13. Nor does the State or counties inform voters that if their local election official finds a supposed discrepancy with their signature, the official will reject their ballot entirely. Indeed, in at least some New Jersey counties, including Middlesex and Monmouth, officials give mail-in voters false information, advising them that all mail-in ballots are counted and included in the election results. Ex. 1 (Middlesex County Elections FAQ)[1]; Ex 2 (Monmouth County Vote by Mail).[2]

While providing voters no pre-rejection notice of ballot impairments or opportunity to contest the State's error-prone handwriting analysis, the State does virtually nothing to ensure that the analysis is accurate. The State does not require that officials of the 21 county boards of elections receive training in signature or handwriting analysis. It provides them no written standards or guidelines to aid in this assessment. It neither dictates nor even suggests that officials spend any minimum amount of time comparing the signature exemplars when examining mail-in ballots. It does nothing to ensure that county officials across the State follow the same approach. In sum, New Jersey essentially guarantees that the mail-in voting

[1] Middlesex County NJ, FAQ About Elections, http://www.middlesexcountynj.gov/Government/Departments/CS/Pages/County%20Clerk/FAQ%20About%20Elections.aspx (last visited May 13, 2020).
[2] Hudson County NJ, FAQ About Elections, Monmouth County Votes, Vote By Mail, https://www.monmouthcountyvotes.com/voter-information/vote-by-mail/ (last visited May 13, 2020).

process will be riddled with errors, and then prevents voters from doing anything about it.

Indeed, New Jersey law requires only that the State provide voters with a "free-access system," such as a toll-free hotline or website, that they may access *after* the election to determine whether their ballot was counted, and if not, why. N.J. Stat. § 19:61-5. At that point, if a voter learns that New Jersey has rejected their ballot—either by affirmatively inquiring themselves or through any post-deprivation notice provided by the county—the election is over, and the voter's disenfranchisement is irreparable.

The State could give mail-in voters notice before rejecting their vote and afford a meaningful opportunity to cure. Indeed, for mail-in ballot *applications*, the State does just that, notifying the voter of any deficiency related to their signature and affording the opportunity to renew their application or vote in person. N.J. Stat. § 19:63-8. Further, the State has authority to train election officials and issue guidelines to standardize signature verification across the state. State law charges Defendant Way with overseeing the training of local election officials. N.J. Stat. § 19:50-1(b). And, more broadly, the law specifically authorizes the Secretary of State to adopt rules and regulations to govern the vote by mail system. The State has let these powers lie dormant while errors proliferate and New Jersey citizens needlessly lose their right to vote.

Implementing a pre-rejection notice and opportunity to cure procedure for voters would not significantly burden the State. State and local election officials already have access to voter files containing voter information such as addresses, phone numbers, and emails, which they could use to provide mail-in voters whose ballots have signature related impairments with notice that their ballot may be rejected and an opportunity to cure.

## II.     PROVISIONAL VOTING IN NEW JERSEY

When voters seek to cast their ballots in-person, issues arise sometimes as to whether they can lawfully vote. Sometimes, the person may not be permitted to vote or may be required to go to a different polling place.  N.J. Stat. §§ 19:53C-3. In other circumstances, a voter has the right to vote by provisional ballot. *Id.*

Specifically, any registered voter who appears at a polling place on Election Day may vote by provisional ballot if (a) they moved within a municipality, but to a different election district, and did not update their address; (b) they moved within a county and did not update their address; (c) their registration information is missing; or (d) they applied for a mail-in ballot and did not receive or submit it. *Id.*

On May 15, 2020, Governor Murphy signed Executive Order 144, which mandates that: "Any voter who appears at a polling place on the day of the July

primary shall vote via a provisional ballot, except that a voter with disabilities may vote on an ADA-accessible voting machine." Ex. 3 (Exec. Order No. 144).3

A voter casting a provisional ballot at a polling place is handed a provisional ballot packet prepared by the county clerk, or municipal clerk in a municipal election. The packet includes an envelope, affirmation statement, and a written notice. N.J. Stat. § 19:53C-1. The affirmation statement includes space for the voter's name, the reason for voting provisionally, space to provide the voters' most recent prior voter registration address, address on the day of the election, and the voter's date of birth. *Id.*

In addition, the affirmation includes the statement: "I swear or affirm, that the foregoing statements made by me are true and correct and that I understand that any fraudulent voting may subject me to a fine of up to $15,000, imprisonment up to five years or both, pursuant to R.S.19:34-11." *Id.* The voter must sign the affirmation statement prior to or immediately after casting the provisional ballot. N.J. Stat. § 19:53C-6. Upon completing the provisional ballot, the voter must place it in the envelope, seal the envelope, and then hand it to a member of the district board. *Id.* § 19:53C-10. The member of the district board hands the voter a written notice of instructions on how the voter may access information regarding the status of the

3 *See* N.J. Exec. Order No. 144, ¶ 10 (May 15, 2020), https://nj.gov/infobank/eo/056murphy/pdf/EO-144.pdf.

8

provisional ballot, whether their vote was counted, and if rejected, the reason for rejection. *Id.* Neither in this notice nor any other is the State required to warn the voter that their provisional ballot may be rejected because of a signature match issue. *Id.*

Once the provisional ballot is delivered to the county for counting, the process is nearly identical to the one governing mail-in ballots. County election officials are required to compare the "name, signature and other information contained on the form as supplied by a voter" with the same information in the voter registration system for the voter. N.J. Stat. § 19:53C-13. In other words, officials compare the voter's signature on the provisional ballot to the signature on their voter registration form. These officials, again, are not handwriting experts.

There is no requirement that the State notify the voter of the issues regarding their signature, unless the voter calls the hotline or checks the Division of Elections' website to determine their status. The voter also has no opportunity to cure provisional ballot defects. The county board decides by majority vote whether to accept or reject the voter's provisional ballot, and that decision is "final." N.J. Stat. § 19:53C-18.

### III. NEW JERSEY'S SIGNATURE VERIFICATION PROCEDURE FOR MAIL-IN AND PROVISIONAL BALLOTS IS UNACCEPTABLY ERROR-PRONE

Signature verification is an inherently flawed means of determining whether a mail-in or provisional ballot is fraudulent or inappropriately cast.

No two signatures, even if written by the same person, are exactly alike. Many factors affect the consistency of a signature from one signing (*i.e.*, the mail-in ballot application or voter registration) to another (*i.e.*, the mail-in ballot), including such factors as the type of pen, writing surface, stress, or other writing conditions. Declaration of Linton A. Mohammed ("Mohammed Decl.") ¶¶ 34-35.

Signature variance is more common among certain populations of voters, including those with disabilities, those with less formal education, elderly and young voters, and voters for whom English is a second language. Parkinsonism and other neurological disorders can also significantly affect handwriting characteristics, engender unfounded scrutiny over the authenticity of signatures, and impede accurate assessment of them. *Id.* ¶¶ 40-42; *see also* Declaration of William Riggs ("Riggs Decl.") ¶¶ 6-7.

And while New Jersey does not maintain the racial or demographic data of those whose ballots are rejected, a study in Florida found that Black and Latina/o voters were more likely to have their ballots rejected. In 2016, 1.9% of Black voters' ballots and 1.8% of Hispanic voters ballots in Florida were rejected, compared to a

rejection rate of only 0.7% among white voters. Ex. 4.[4] Indeed, higher rejection rates in some of New Jersey's most diverse counties suggest a similar trend in this State. *See infra* Facts Section IV.

Even experienced forensic document examiners (FDEs) can find it difficult if not impossible to distinguish natural variations in a person's signature from fraudulent ones, especially where the reviewer has limited exemplars to compare. Mohammed Decl. ¶¶ 27-29.

Laypersons, such as New Jersey election officials, have a significantly higher rate of error in determining whether signatures are genuine. Laypersons are also more likely to wrongly determine that authentic signatures are not genuine than to make the opposite error. In one study, laypeople incorrectly judged authentic signatures to be inauthentic more than 26% of the time. *Id.* ¶ 29.

Thus, in every election, the untrained election officials responsible for signature verification under New Jersey's mail-in ballot verification system reject validly cast ballots because of erroneous judgments on signature matching issues. *See, e.g.*, Declaration of Belina Grill ("Grill Decl.") ¶ 4 & Ex. A; Declaration of Sarah Katherine Céspedes ("Céspedes Decl.") ¶ 6; Declaration of Jessica Burns ("Burns Decl.") ¶ 6; Declaration of Shamisa Zvoma ("Zvoma Decl.") ¶ 4;

---

[4] *See* Daniel A. Smith, *Vote-By-Mail Ballots Cast in Florida,* AMERICAN CIVIL LIBERTIES UNION OF FLORIDA (Sep. 19, 2018), https://www.aclufl.org/en/publications/vote-mail-ballots-cast-florida.

11

Declaration of Olivia Brinton ("Brinton Decl.") ¶¶ 4-5; Declaration of Anfal Muhammad-Jenkins ("Muhammad-Jenkins Decl.") ¶ 4; Ex. 5 (EAVS 2016);[5] Ex. 6 (EAVS 2018).[6]

Also, because election officials undertake this task without standardized guidelines or procedures governing their analysis, they reject ballots based on arbitrary, variable criteria. Vote-by-mail and provisional ballot rejection rates for signature matching issues therefore vary significantly from county to county in New Jersey. For example, in the 2016 general election, Hudson County, New Jersey's most diverse county, rejected mail-in ballots based on failure to match signatures at a rate 172 times the rejection rate in Gloucester County, one of the least diverse counties in the state. Ex. 5 (EAVS 2016). In 2014, Essex County, the county with the highest Black population in New Jersey, had the highest rejection rate in the State based on signature issues. *Id.* In 2018, Camden County, where one of New Jersey's most diverse cities, Camden, is located, had the highest percentage of total provisional ballots cast rejected because of signature match. Ex. 6 (EAVS 2018).

Similarly, the *unintentional* omission of a voter's signature from their mail-in or provisional ballot often reflects innocent user error rather than fraud or

---

[5] Election Administration and Voting Survey Datasets ("EAVS 2016") (2016), https://www.eac.gov/research-and-data/datasets-codebooks-and-surveys.
[6] Election Administration and Voting Survey Datasets Version 1.2 ("EAVS 2018") (Feb. 18, 2020), https://www.eac.gov/research-and-data/datasets-codebooks-and-surveys.

misconduct. The State could easily resolve such an error simply by providing the affected voter with notice of the problem and an opportunity to fix it.

## IV. NEW JERSEY'S CONSTITUTIONALLY DEFICIENT SIGNATURE-VERIFICATION PROCESS DENIES THE RIGHT TO VOTE TO THOUSANDS OF VOTERS

Each election, New Jersey's signature verification system affects thousands of New Jersey voters, often at least one percent of all mail-in voters, who have their ballots rejected for benign, or nonexistent, signature-related deficiencies, such as an omitted signature or a signature that could not be "matched" to either the vote-by-mail application or the voter registration form. Ex. 5 (EAVS 2016).

During the 2016 presidential general election, for example, over 355,000 New Jersey voters cast their ballots by mail. About 4,000 of those voters, representing approximately one percent of the by-mail votes cast in the election, did not have their votes counted because of a signature-related problem, including over 1,100 rejected because of the perceived signature mismatch. *Id.*

 Eleven percent of absentee ballot rejections statewide in the 2016 election were attributable to a perceived signature mismatch. *Id.* However, the likelihood of a signature-related ballot rejection varied significantly depending on the absentee voter's county of residence. For example, 11.76% of rejected absentee ballots were for signature mismatch issues in Union County, compared to 38.97% of rejected absentee ballots in Hudson County. *Id.*

13

Two years later, in the 2018 midterm election, the results were no better. Out of the approximately 400,000 New Jersey voters who cast their ballots by mail, approximately 6,000, or about 1.5% of all by-mail voters, had their ballots rejected— and their votes consequently not counted—based on a signature-related deficiency, including nearly 2,000 due to the perceived lack of a signature match. Ex. 6 (EAVS 2018).

Again, the likelihood of a signature-related ballot rejection varied based on the absentee voter's county of residence. Whereas in the 2018 election, 16.4% of absentee ballots rejected statewide were rejected for signature match issues, the rate of rejection varied dramatically from county to county. *Id.* For example, only 3.3% of rejected absentee ballots were rejected in Union County for signature match issues, compared to 34.9% in Hudson County. *Id.*

Some voters, like Plaintiff Deborah J. Riska, have been disenfranchised in multiple elections due to signature match issues. Ms. Riska's validly cast mail-in ballots were discarded in both 2016 and 2018 due to purported signature impairments. Declaration of Deborah J. Riska ("Riska Decl.") ¶ 3; Ex. 10 (Morris County Mail-in Ballot Rejections 2018 November Election); Ex. 11 (Morris County Mail-in Ballot Rejections 2016 November General Election). Ms. Riska did not learn of her 2018 disenfranchisement until January of 2019, when she received a letter notification three months *after* the election. *Id.* ¶ 4. She did not learn of her 2016

14

disenfranchisement until recently. *Id.* ¶ 3. To avoid being disenfranchised again, Ms. Riska attempted to vote in-person at her polling location in 2019, but was not allowed to because she was on the mail-in ballot list. *Id.* ¶ 5. She was even refused the opportunity to vote provisionally. It was made clear to Ms. Riska that her only option was voting by mail—an undertaking that she believed to be futile based on her prior experience. As a result, she simply did not vote in 2019. *Id.*

Signature mismatch issues have disenfranchised provisional ballot voters as well. County boards have rejected hundreds of provisional ballots in previous elections—almost 300 in 2018—because of signature mismatch issues. Ex. 6 (EAVS 2018). This number will only increase this year as provisional voting will be the only in-person voting option for the vast majority of voters.

New Jersey's unreliable signature verification procedures advance no legitimate state interest. Nor does the State's failure to provide notice and an opportunity to cure an ostensible signature-related defect serve any legitimate governmental purpose.

## V.   NEW JERSEY'S CONSTITUTIONALLY DEFICIENT SIGNATURE-VERIFICATION PROCESS WILL AFFECT A GROWING NUMBER OF VOTERS

The number of New Jerseyans who will vote by mail or provisional ballot—and thus the number of voters whose ballots will be rejected through New Jersey's signature-verification process—has increased and is likely to increase dramatically

in upcoming elections, including the July 7, 2020 primary election and the November 3, 2020 general election. Burns Decl. ¶ 4; Declaration of Richard Smith ("Smith Decl.") ¶ 7.

Even before the May 12, 2020 election, which was conducted entirely by mail, the number of people voting by mail in New Jersey had already begun to increase, and New Jersey's recent expansion of its vote-by-mail law made it easier for them to do so.

The ongoing COVID-19 pandemic has accelerated, and will continue to accelerate, New Jersey's dramatic shift towards mail-in voting. Burns Decl. ¶ 5; Smith Decl. ¶ 6. The State, echoing the Centers for Disease Control and Prevention ("CDC"), recommends that to protect themselves from COVID-19, all citizens should "stay at home . . . except to get essentials" and that "additional steps" may be warranted for older adults and those with chronic or underlying conditions that place them at increased risk of complications from the disease. Ex. 7 (NJ COVID-19 Information Hub).[7] Moreover, the CDC's first recommendation for election officials

---

[7] New Jersey COVID-19 Information Hub, https://covid19.nj.gov/faqs/nj-information/general-public/how-can-i-protect-myself-from-covid-19/novel-coronavirus (last updated May 7, 2020).

in the midst of this pandemic is to "[e]ncourage mail-in methods of voting." Ex. 8

(CDC Recommendations).[8]

Heeding the CDC's advice, Governor Murphy issued Executive Order 105 on

March 19, 2020. Ex. 9 (Executive Order 105).[9] Pursuant to this Order, the over 30

local elections scheduled for May 12, 2020 were all[10] vote-by-mail. *Id.*; Ex. 12

[11](New Jersey Division of Elections 2020 Election Information). Counties mailed all

registered voters in those municipalities a ballot with prepaid postage. Ex. 9

(Executive Order 105). Without an application, the signature on the voter's ballot

was compared to the voter's registration form. This eliminated the nominal notice

process New Jersey law has of alerting voters of the rejection of their vote-by-mail

application because of a signature match issue. Moreover, it ensured that the

signatures compared to the signed ballot envelopes will be even staler, potentially

dating back decades.

---

[8] Ctrs. for Disease Control and Prevention, Recommendations for Election Polling
Locations, https://www.cdc.gov/coronavirus/2019-ncov/community/election-
polling-locations.html (last updated Mar. 27, 2020).
[9] N.J. Executive Order No. 105 (March 19, 2020),
https://www.state.nj.us/infobank/eo/056murphy/pdf/EO-105.pdf.
[10] As an accommodation, counties provided certain members of the disability
community with the ability to vote electronically or in-person.
[11] N.J. Department of State, Division of Elections, 2020 Election Information,
https://www.state.nj.us/state/elections/election-information-2020.shtml#may12
(last visited June 2, 2020).

The result, as expected, was the disenfranchisement of many eligible New Jersey voters who properly submitted their mail-in ballots. For example, Essex County resident Sarah Katherine Céspedes received a letter on May 22, 2020 indicating that her May 2020 ballot was "not eligible to be counted" because the signature on the ballot did not match the one currently on the voter roll. Céspedes Decl. ¶ 6. The mayoral race in her town was decided by fewer than 200 votes, and Ms. Céspedes knows of several other people in her community whose ballots were also rejected. *Id.* ¶ 8. Plaintiff Shamisa Zvoma received a similar letter on the same date, indicating that her ballot was rejected because the signature on the ballot did not match the one on the voter roll. Declaration of Shamisa Zvoma ("Zvoma Decl.") ¶ 4 & Ex. A. Both rejections were erroneous. *Id.*

Similarly, On May 20, 2020, Monmouth County voter Belina Grill received a letter from the Monmouth County Board of Elections Commissioners informing her that the county had rejected her ballot because the signature on the ballot did not match the one in their records. Grill Decl. ¶ 4 & Ex. A. After her husband called the County Board of Elections Commissioners to ask about the rejection, they sent her a copy of the two signatures used for comparison. Both belonged to Ms. Grill. *Id.* ¶¶ 5-6.

Some voters were not afforded even the opportunity to compare the signatures at issue. Essex County resident Olivia Brinton received a letter on May

18

22, 2020 informing her that her ballot was rejected, and when she called to complain, she was simply told to submit a written complaint. Brinton Decl. ¶¶ 4-5.

On May 15, 2020, Governor Murphy issued Executive Order 144 regarding the July 7, 2020 primary elections. Ex. 3. To reduce lines for in-person voting and to encourage people to vote by mail, this Order provided that all active registered Democrats and Republicans will receive vote-by-mail ballots with prepaid postage. *Id.* All unaffiliated voters and inactive registered Democrats and Republicans will receive a vote-by-mail application with prepaid postage. *Id.* Thus, once again, many voters will have no vote-by-mail application signature to which county officials can compare the signature on their ballot certifications, and the only exemplar for comparison will be stale voter registration signatures. While there will be limited in-person polling places open in all municipalities, other than as an accommodation for certain members of the disability community, all in-person voting will be through provisional ballots. *Id.* Accordingly, absent relief from this Court, a significant proportion of voters will be erroneously disenfranchised.

## ARGUMENT

"A party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Kos Pharm.,*

*Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). Because New Jersey's error-prone signature matching procedures subject voters to a constitutionally unacceptable risk of arbitrary disenfranchisement without meaningful notice and recourse, Plaintiffs satisfy each of these factors.

## I.   PLAINTIFFS WILL SUCCEED ON THE MERITS OF THEIR CLAIMS

### A.   Plaintiffs Will Prevail on the Merits of Their Procedural Due Process Claim

In assessing whether a state action violates the due process clause, the Court employs a "'familiar two-stage analysis,' inquiring (1) whether 'the asserted individual interests are encompassed within the fourteenth amendment's protection of life, liberty, or property'; and (2) whether the procedures available provided the plaintiff with 'due process of law.'" *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000) (quoting *Robb v. City of Philadelphia*, 733 F.2d 286, 292 (3d Cir.1984)).

The right to vote is unquestionably a core liberty interest protected by the Due Process Clause.[12] Thus, "once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). To

---

[12] *See, e.g.*, *Cook v. Randolph Cty.*, 573 F.3d 1143, 1152 (11th Cir. 2009) (noting that "[t]he Constitution guarantees procedural and substantive due process when a liberty interest is at stake," including "the right to vote"); *Barefoot v. City of Wilmington*, 306 F.3d 113, 124 n.5 (4th Cir. 2002) ("The right to vote . . . is certainly a protected liberty interest.").

make that determination, the Court uses the three-factor test announced by the United States Supreme Court in *Mathews v. Eldridge*, balancing: "(1) 'the private interest that will be affected by the official action'; (2) 'the risk of an erroneous deprivation of such interest through the procedures used' and the value of 'additional or substitute procedural safeguards' in avoiding such errors; and (3) the governmental interest, 'including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement[s] would entail.'" *Augustin v. City of Philadelphia*, 897 F.3d 142, 149 (3d Cir. 2018) (quoting *Mathews v. Eldridge*, 426 U.S. 319, 335 (1976)). Although the *Eldridge* framework is flexible, an "essential principle" guiding its application is that the government may not "postpone the hearing until after the deprivation has already occurred" except in "extraordinary situations" where crucial governmental interests are at stake. *Schmidt v. Creedon*, 638 F.3d 587, 595-96 (3d Cir. 2011) (internal quotation marks omitted).

New Jersey's signature verification regime fails this test. New Jersey rejects voters' ballots using a standardless, arbitrary, and unreliable ballot verification process, denying the fundamental right to vote without *any* pre-deprivation notice or opportunity to cure ballot impairments.

Courts considering challenges to signature matching regimes that, like New Jersey's, lack any pre-deprivation protections for voters, have uniformly enjoined

21

them. *See, e.g.*, *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1338-40 (N.D. Ga. 2018); *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 214-22 (D.N.H. 2018); *Zessar v. Helander*, No. 05 Civ. 1917, 2006 WL 642646, at *6-*9 (N.D. Ill. Mar. 13, 2006); *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990). This court should do the same.

### 1.    The Private Interest at Stake Is Fundamental

The first *Eldridge* factor weighs heavily in Plaintiffs' favor. "There is no right more basic in our democracy than the right to participate in electing our political leaders." *McCutcheon v. FEC*, 572 U.S. 185, 191 (2014). Thus, courts considering similar challenges to procedurally deficient signature matching regimes have uniformly found that the first *Eldridge* factor strongly favors plaintiffs because of the foundational importance of voting rights. *See, e.g.*, *Martin*, 341 F. Supp. 3d at 1338 (finding that "the private interest at issue implicates the individual's fundamental right to vote and is therefore entitled to substantial weight"); *Saucedo*, 335 F. Supp. 3d at 217 (according private interest factor "significant weight" in light of constitutional significance of voting rights).

Nor is the private interest at stake diminished merely because New Jerseyans' right to vote by mail is creature of state law. "A liberty interest . . . may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005); *accord Paul v. Davis*, 424 U.S. 693, 710-11 (1976). Having

affirmatively created a vote by mail regime as a means by which all eligible voters may exercise their fundamental right to vote, the State may not arbitrarily disenfranchise citizens who avail themselves of that process. *Saucedo*, 335 F. Supp. 3d at 217 ("Having induced voters to vote by absentee ballot, the State must provide adequate process to ensure that voters' ballots are fairly considered and, if eligible, counted.").

The weight of this interest only increases where, as here, mail-in and provisional voting will be functionally the *only* means available to many voters to safely exercise their constitutional right to vote. *See O'Brien v. Skinner*, 414 U.S. 524, 530 (1974) (sustaining a constitutional challenge to absentee voting rules under which prisoners were "simply not allowed to use the absentee ballot and [were] denied any alternative means of casting their vote although they [were] legally qualified to vote"). Thus, because of COVID-19 and the sharp expected increase in ballots cast by mail and provisional ballots in New Jersey during the 2020 primary and general elections, Plaintiffs and voters across the State have an even greater liberty interest in ensuring they will not be disenfranchised by New Jersey's mail-in ballot verification procedures.

2.  **New Jersey's Procedures Guarantee Erroneous Deprivations, And the Additional Safeguards Plaintiffs Seek Would Avoid These Errors**

The second *Eldridge* factor—the probable value of additional process in reducing the risk of erroneous deprivations—also favors Plaintiffs. By providing voters with pre-deprivation notice and opportunity to cure signature impairments, New Jersey can give eligible voters a chance to correct erroneous determinations and ensure they are not disenfranchised because of a benign signature issue, or an error by the State. Indeed, the requirement of pre-deprivation notice is a "default rule" in procedural due process cases. *Montanez v. Sec'y Pennsylvania Dep't of Corr.*, 773 F.3d 472, 483 (3d Cir. 2014). As the Third Circuit has recognized, "when an individual is not provided with any form of pre-deprivation process, as in this case, the risk of an erroneous deprivation of his constitutionally protected interest— *i.e.*, the second factor of the *Mathews* balancing—is heightened considerably." *Dee v. Borough of Dunmore*, 549 F.3d 225, 232 (3d Cir. 2008).

This is especially true here, because New Jersey's signature match procedures are virtually certain to erroneously reject valid ballots. As Plaintiffs' expert Dr. Linton A. Mohammed explains, "[d]etermining whether a signature is genuine is a difficult task for even a trained [Forensic Document Examiner]," and laypeople "have a significantly higher rate of error in determining whether signatures are genuine." Mohammed Decl. ¶ 21; *see also United States v. Velasquez*, 64 F.3d 844,

24

850 (3d Cir. 1995) (noting that "the field of handwriting analysis consists of scientific, technical or other specialized knowledge" that is uniquely the province of trained experts). Yet New Jersey tasks untrained laypeople with analyzing the signatures of mail-in voters to make one of the most constitutionally consequential decisions imaginable: whether or not to count a citizen's vote.

County election officials in New Jersey "lack the tools and training to properly account for signature variation, which leads to erroneous mismatch determinations that are particularly pronounced in populations with greater signature variability, such as the elderly, disabled, individuals suffering from poor health, young voters (ages 18 to 21), and non-native English speakers." Mohammed Decl. ¶ 22. Officials rely on impressionistic comparisons using inadequate signature samples and are not required to take the minimum of two hours necessary for even a trained examiner to accurately conduct a signature analysis. *Id.* ¶ 24. Accordingly, they are "particularly prone to making erroneous signature match determinations" and improperly reject ballots that have been properly cast. *Id.* ¶ 47.

Pre-deprivation notice and hearing are essential here. Under New Jersey's current system, once the non-expert examiners make erroneous determinations, voters have no recourse. The right to vote in the affected election is gone. Without pre-deprivation process, "[i]t cannot be emphasized enough that the consequence of a moderator's decision—disenfranchisement—is irremediable." *Saucedo*, 335 F.

Supp. 3d at 218. Courts have therefore routinely found that providing notice of an alleged signature defect only after the voter's ballot is rejected is constitutionally insufficient. *See, e.g.*, *La Follette v. Padilla*, No. CPF-17-515931, 2018 WL 3953766 (Cal. Super. Ct. Mar. 5, 2018) (finding that posting a list of affected voters online does not provide sufficient notice); *Saucedo*, 335 F. Supp. 3d at 218 (finding that providing voters with the ability to use the state's website to see if their ballots had been invalidated did not provide adequate notice); *Zessar*, 2006 WL 642646 at *9 (finding post-election notice postcards did not meet constitutional notice requirements).

Notably, New Jersey law *already* permits election officials to consider "any other available information" in determining whether the signature on a mail-in ballot application is authentic. N.J. Stat. § 19:63-8. "Necessarily, the premise of such a process is that the consideration of extrinsic evidence can be useful in determining whether the same person executed both the affidavit envelope and application. Plaintiffs seek no more than to open up that process to allow for consideration of evidence from the best source—the voter." *Saucedo*, 335 F. Supp. 3d at 219.

Providing pre-deprivation notice and an opportunity to cure perceived mail-in ballot deficiencies would significantly reduce the risk of erroneous disenfranchisement. *See Martin*, 341 F. Supp. 23d at 1339 (holding that "permitting an absentee voter to resolve an alleged signature discrepancy . . . has the very

26

tangible benefit of avoiding disenfranchisement"); *Saucedo*, 335 F. Supp. 3d at 219; *Zessar*, 2006 WL 642646, at *9. In light of the high risk of erroneous deprivations and the indisputable effectiveness of the simple notice-and-cure procedure Plaintiffs seek, the second *Eldridge* factor—and simple fairness—favors granting relief.

### 3. The State's Interest in Rejecting Ballots Without Meaningful Pre-Deprivation Process Is Minimal

The third *Eldridge* factor also favors Plaintiffs. States have no legitimate interest in disenfranchising eligible voters without due process of law. Indeed, insofar as the purpose of New Jersey's existing signature matching regime is to ensure "that the voter is legally entitled to vote," N.J. Stat. § 19:63-17, adding procedural safeguards advances that purpose by expanding the information available to officials in making the determination. "Thus, if anything, additional procedures further the State's interest in preventing voter fraud while ensuring that qualified voters are not wrongly disenfranchised." *Saucedo*, 335 F. Supp. 3d at 220; *see also Fla. Democratic Party v. Detzner*, No. 16 Civ. 607, 2016 WL 6090943, at *7 (N.D. Fla. Oct. 16, 2016) (observing that "letting mismatched-signature voters cure their vote by proving their identity *further* prevents voter fraud—it allows supervisors of elections to confirm the identity of that voter before their vote is counted").

Moreover, there is no reasonable argument that providing mail-in and provisional voters with notice and an opportunity to cure signature issues would place an undue fiscal or administrative burden on the State. New Jersey already has

the information and infrastructure it needs to affect this change. The State collects voters' contact information through their registration and ballot request forms and uses this information to inform them when there are signature impairments on their mail-in ballot request forms pre-election, N.J. Stat. § 19:63-8, and of ballot impairments post-election, N.J. Stat. § 19:61-5. The State can easily use this infrastructure to provide voters with the constitutionally required pre-rejection notice and opportunity to cure ballot defects. *See Martin*, 341 F. Supp. 3d at 1339-40 ("Because many of the procedures Plaintiffs request are already in place, the Court finds that additional procedures would involve minimal administrative burdens while still furthering the State's asserted interest in maintaining the integrity of its elections."); *Saucedo*, 335 F. Supp. 3d at 221 (concluding that pre-deprivation "would not entail significant administrative burdens," especially when "procedures already exist which could be readily extended").

Particularly because of New Jersey's error-prone signature matching procedures to authenticate mail-in and provisional ballots, the State must provide voters with meaningful notice of any perceived signature match issue and an opportunity to resolve it to avoid erroneous deprivation of their fundamental right to vote. Plaintiffs are therefore likely to succeed on the merits of their due process claim.

28

**B.    Plaintiffs Will Prevail on the Merits of Their Claim that New Jersey Unconstitutionally Burdens the Fundamental Right to Vote.**

Plaintiffs are likely to prevail on their claim that New Jersey's signature match procedures unconstitutionally burden the fundamental right to vote. This claim is assessed "under what has come to be known as the *Anderson-Burdick* balancing test." *Wilmouth v. Sec'y of N.J.*, 731 F. App'x 97, 102 (3d Cir. 2018), so named after the Supreme Court's decisions in *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983) and *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).

Under *Anderson-Burdick*, "[t]o determine whether a state election law violates the U.S. Constitution," courts "first examine whether the challenged law burdens rights protected by the First and Fourteenth Amendments." *Patriot Party of Allegheny Cty. v. Allegheny Cty. Dep't of Elections*, 95 F.3d 253, 258 (3d Cir. 1996). "If the law does burden protected rights," the court "must gauge the character and magnitude of the burden on the plaintiff and weigh it against the importance of the interests that the state proffers to justify the burden," taking into account "not only the legitimacy and strength of the state's proffered interests, but the necessity of burdening the plaintiff's rights in order to protect those interests." *Id.* If the burden on the plaintiff's rights is severe, the state's interest must be compelling, and the law must be narrowly tailored to serve the state's interests." *Id.*

29

### 1. New Jersey's Use of an Error-Prone Signature Match System Severely Burden's Plaintiffs' Right to Vote

New Jersey's signature matching procedures impose a severe burden on the right to vote. Every election, New Jersey's error-prone signature match procedures cause the summary rejection of eligible voters' validly cast ballots and completely deprive these voters of their right to vote. COVID-19 has amplified this burden by making in-person voting unsafe and, in some cases, impossible. And for voters like Plaintiff Riggs, whose age and underlying health conditions affect the variability of their handwriting and make it impossible for them to produce a consistent signature, the burden is especially severe. Riggs Decl. ¶¶ 6-7. Perversely, such voters with underlying health conditions or disabilities—voters who are among those most likely to rely on vote by mail to access the franchise under ordinary circumstances, and especially during the COVID-19 pandemic—are also disproportionately likely to have their ballots rejected for signature issues. Mohammed Decl. ¶¶ 22, 26, 34. Voters like Mr. Riggs face arbitrary and erroneous disenfranchisement with no recourse or remedy. It is difficult to conceive of a more severe burden on the fundamental right to vote.

Other courts that have considered standardless, procedurally deficient signature matching systems like New Jersey's have found them to pose substantial burdens on the right to vote under the *Anderson-Burdick* framework. *See, e.g.*, *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1321 (11th Cir. 2019)

30

(finding that error-prone signature matching process "imposes at least a serious burden on the right to vote"); *see also Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 593 (6th Cir. 2012) (holding that disqualification of provisional ballots cast in the wrong precinct was a "substantial burden on provisional voters"). As one court observed in enjoining a signature matching regime similar to New Jersey's:

> During this election cycle, millions of voters across the state will march happily to their mailbox and attempt to exercise their fundamental right to vote by mailing their vote-by-mail ballot. After the election, thousands of those same voters—through no fault of their own and without any notice or opportunity to cure—will learn that their vote was not counted. If disenfranchising thousands of eligible voters does not amount to a severe burden on the right to vote, then this Court is at a loss as to what does.

*Detzner*, 2016 WL 6090943, at *6.

## 2. New Jersey's Interest in Maintaining its Signature Match Procedures Does Not Outweigh the Severe Burden It Places on Plaintiffs' Right to Vote.

No legitimate state interest justifies New Jersey's procedurally deficient signature matching procedures, much less an interest significant enough to justify the severe burdens the State's scheme imposes on voting rights.

Under *Anderson-Burdick*, the Court must consider whether important State interests "make it *necessary* to burden" Plaintiffs' rights. *Anderson*, 460 U.S. at 789 (emphasis added). The State has the resources it needs to provide voters with notice and an opportunity to cure signature issues. There is simply no reason New Jersey "cannot have both a robust signature-match protection and a way to allow every eligible vote-by-mail . . . voter whose ballot is mistakenly rejected an opportunity to

31

verify their identities and have their votes count." *Lee*, 915 F.3d at 1322 (noting absence of any "fraud-prevention interest that justifies depriving legitimate vote-by-mail . . . voters of the ability to cure the signature mismatch, thereby disenfranchising them"). The relief Plaintiffs seek would also further, not undermine, the State's interest in promoting fairness and confidence in the integrity of its elections, because "public faith in elections benefits from providing injured voters the opportunity to have their legitimately cast ballots counted when the reason they were not counted was not the voters' fault." *Id.* at 1326.

New Jersey's signature matching procedures for authenticating mail-in and provisional ballots severely burden the right to vote without furthering any legitimate State interest. Accordingly, Plaintiffs are likely to succeed on the merits of their constitutional claims.

### C. Plaintiffs Will Prevail on the Merits of Their Equal Protection Claim

Because they fail to ensure that counties and election officials across the State employ uniform standards for ballot rejection, New Jersey's signature match procedures violate the Equal Protection Clause.

"Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value on person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000). The use of differing ballot authentication procedures across the state violates this principle. "A state must impose uniform statewide standards in each county in order to protect the legality of a citizen's vote.

Anything less implicates constitutional problems under the equal protection clause of the Fourteenth Amendment." *Pierce v. Allegheny Cty. Bd. of Elections*, 324 F. Supp. 2d 684, 697 (W.D. Pa. 2003); *see also Bush*, 531 U.S. at 106 (finding equal protection violation where "the standards for accepting or rejecting contested ballots might vary not only from county to county but indeed within a single county from one recount team to another").

The State has promulgated no guidance to county officials to ensure New Jersey's signature matching process is uniformly imposed. In *Lee*, the Eleventh Circuit affirmed the grant of a preliminary injunction requiring Florida to provide mail-in voters with an opportunity to demonstrate their eligibility before rejecting their ballots on signature mismatch grounds. 915 F.3d. Just like New Jersey, "Florida ha[d] not enacted uniform standards for matching signatures, nor ha[d] it created qualifications or training for those who engage in the job." *Id.* at 1319. And Florida, like New Jersey, "allow[ed] each county to apply its own standards and procedures for executing the signature match requirement, virtually guaranteeing a crazy quilt of enforcement of the requirement from county to county." *Id.* at 1320. New Jersey's failure to ensure uniform application of its statutory signature matching requirement across the State, like Florida's, violates the Equal Protection Clause.

Evidence from prior election confirms that, in the absence of statewide standards, New Jersey's mail-in voters are subject to arbitrary disenfranchisement

33

based on where they live. Mail-in ballot rejection rates for signature matching issues vary wildly from county to county in New Jersey. For example, in the 2016 general election, Hudson County rejected mail-in ballots based on failure to match signatures at a rate of 172 times the rejection rate in Gloucester County. Notably, Hudson County is New Jersey's most diverse county, while Gloucester is one of the whitest counties in the state. Such disparities are irreconcilable with equal protection principles. *See Bush*, 531 U.S. at 107 (finding equal protection violation where one county "used a more forgiving standard" during a recount than another "and uncovered almost three times as many new votes"); *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 478 (6th Cir. 2008) (sustaining equal protection claim where state election system burdened citizens' right to vote "depending on where they live").

The Constitution does not permit states, through arbitrary and inconsistent enforcement of election procedures, to condition voters' franchise on the place where they happen to reside. *Reynolds v. Sims*, 377 U.S. 533, 560 (1964). New Jersey's standardless signature matching procedures run afoul of this principle by disenfranchising voters at vastly unequal rates across the state.

## II.    PLAINTIFFS WILL FACE IRREPERABLE HARM ABSENT AN INJUNCTION

A finding of irreparable harm "clearly follows" from the infringement of constitutional voting rights. *Council of Alt. Political Parties v. Hooks*, 121 F.3d 876, 883 (3d Cir. 1997). This is particularly true in voting rights cases, "[b]ecause there can be no 'do-over' or redress of a denial of the right to vote after an election." *Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016). For this reason, "[c]ourts routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (collecting authorities). As the court held in *Saucedo*, "[i]t cannot be emphasized enough that the consequence of a moderator's decision—disenfranchisement—is irremediable." 335 F. Supp. 3d at 218*; see also Hooks*, 121 F.3d at 883 (unconstitutional state-imposed burdens on voting "cannot be alleviated after the election"). The injury voters face from voting under New Jersey's existing signature match procedures is thus paradigmatic irreparable harm.

## III.   THE BALANCE OF HARMS AND THE PUBLIC INTEREST WEIGH HEAVILY IN PLAINTIFFS' FAVOR

Finally, the balance of harms and public interest weigh in favor of granting a preliminary injunction. While the usual inquiry on a motion for preliminary injunction "calls for assessing the harm to the opposing party and weighing the

public interest," the Supreme Court has clarified that "[t]hese factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

This Circuit has recognized that, "[i]n the absence of legitimate, countervailing concerns, the public interest clearly favors the protection of constitutional rights," including voting rights. *Hooks*, 121 F.3d at 883-84. "By definition," then, "the public interest favors permitting as many qualified voters to vote as possible." *League of Women Voters of N.C.*, 769 F.3d at 247 (internal alterations omitted). Here, preliminary relief will ensure that when eligible New Jersey voters cast valid ballots on July 7 and beyond, the State will either count their ballots or notify them of ballot impairments and give them an opportunity to fix the issue so their votes can count. This relief thus supports the public interest in protecting the fundamental right to vote.

Preliminary relief also supports the public's strong interest in maintaining public confidence in the integrity of elections. As the Eleventh Circuit explained in *Lee:*

> [P]ublic knowledge that legitimate votes were not counted due to no fault of the voters—and with no reasonable notice to the voters that their votes would not be counted and no opportunity to correct that situation—would be harmful to the public's perception of the election's legitimacy. Yet protecting public confidence in elections is deeply important—indeed, critical—to democracy.

915 F.3d at 1327*; see also Marks v. Stinson*, 19 F.3d 873, 887 (3d Cir. 1994) ("The integrity of the election process lies at the heart of any republic."). As long as New

36

Jersey continues to silently reject validly cast ballots on the basis of an error-prone signature verification system, voters cannot have the confidence they deserve that their election results reflect the will of New Jersey's people.

While demonstrating that public interest favors granting preliminary relief is enough here, it is also true that Defendant Way will suffer no harm if relief is granted. To the contrary, the State—like the public at large—has an affirmative interest in protecting voters' confidence in the integrity of elections. *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989). New Jersey has the information it needs to provide voters with notice when there is a signature issue impairing their ballot. Implementing a system for pre-deprivation notice and an opportunity to cure would require few additional resources from the State, a cost well worth the value of protecting the integrity of New Jersey's elections and safeguarding Plaintiffs' most precious fundamental right.

## CONCLUSION

Plaintiffs bring serious, meritorious challenges to the constitutionality of New Jersey's signature matching procedures for authenticating mail-in and provisional ballots. No legitimate government interest justifies reliance on error-prone processes to reject ballots without meaningful notice and an opportunity to cure. Preliminary relief is needed to protect Plaintiffs from the imminent risk of erroneous disenfranchisement. Such relief will further the public interest by promoting

confidence in New Jersey's elections and ensuring that validly cast votes are not wrongfully rejected. Plaintiffs' motion for a preliminary injunction should be granted.

Dated: June 3, 2020

CAMPAIGN LEGAL CENTER

Danielle Lang*
Rob Weiner*
Ravi Doshi*
Dana Paikowsky*^
1101 14th Street NW, Suite 400
Washington, DC 20005
Telephone: (202) 736-2200

KAUFMAN LIEB LEBOWITZ & FRICK LLP

/s/ Alanna Kaufman
Alanna Kaufman
David A. Lebowitz*
10 East 40th Street, Suite 3307
New York, NY 10016
Telephone: (212) 660-2332

NEW JERSEY INSTITUTE FOR SOCIAL JUSTICE

Ryan Haygood
Andrea McChristian*
Henal Patel
60 Park Place, Suite 511
Newark, New Jersey 07102
Telephone: (973) 624-9400

* *Pro hac vice* admission pending
^Licensed in CA only; supervision by Danielle Lang, D.C. Bar member.

*Counsel for Plaintiffs*

38